## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 06-78-P-S |
| | ) | |
| CLAUDENIR BRAIANI, | ) | |
| a/k/a CLAUDIO BRAIANI, | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Claudenir Braiani (also known as Claudio Braiani), charged with (i) four counts of knowingly producing a false United States identification document (a Social Security card), in violation of 18 U.S.C. § 1028(a)(1), (ii) four counts of knowingly transferring a false United States identification document (a Social Security card), in violation of 18 U.S.C. § 1028(a)(2), and (iii) one count of knowingly transferring a document-making implement (a compact disc containing a Photoshop 6 program and a digital image of a Social Security card) with the intent that the implement be used in producing a false identification document, in violation of 18 U.S.C. § 1028(a)(5), *see* Indictment (Docket No. 13), seeks to suppress statements he made following a purported waiver of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966).  *See generally* Defendant's Motion To Suppress Statements Made Following an Involuntary Waiver of Miranda Rights and Evidence Seized From Involuntary Consent To Search Obtained ("Motion To Suppress") (Docket No. 19).[1]  An evidentiary hearing was held before me on December 15, 2006 at which the defendant appeared with

---

[1] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney (*continued on next page*)

counsel and at the conclusion of which counsel for the parties argued orally.  I now recommend that the following findings of fact be adopted and that the Motion To Suppress be deemed moot in part and denied in part.[2]

## I.  Proposed Findings of Fact

On April 18, 2006 James Bell, a criminal investigator and special agent with the Immigration and Customs Enforcement ("ICE") unit of the U.S. Department of Homeland Security ("DHS") in Portland, Maine, became involved in an investigation into the alleged manufacture of false Social Security cards by Claudenir Braiani, a native and citizen of Brazil living in Biddeford, Maine.  On that date, Bell and ICE Senior Special Agent John Remsen met with three confidential ICE informants who reported that Braiani was manufacturing Social Security cards in his residence on Main Street in Biddeford.  The informants also told Bell and Remsen that Braiani worked at a Dunkin' Donuts on Main Street in Saco and as a floor cleaner at a Hannaford grocery store and that he was believed to have been a police officer in Brazil.

Thereafter Bell made several trips to the Saco Dunkin' Donuts while Braiani – whom Bell identified at hearing as the defendant in this case – was at work behind the counter.  As the defendant waited on Bell, the two had simple conversations in English pertaining to ordering coffee and making change.  Bell had no difficulty understanding the defendant's English.  In addition, at the direction of ICE, two confidential informants participated in a total of six monitored and recorded phone calls with the defendant, all in Portuguese, that culminated in their purchase of counterfeit Social Security cards from the defendant.  Bell obtained translations of these conversations into English from the DHS

---

one will be appointed for him prior to any questioning if he so desires."  *Miranda*, 384 U.S. at 478-79.

[2] The defendant also originally sought to suppress evidence seized from his vehicles following the execution of a "Consent To Search" document.  *See* Motion To Suppress at 1.  At hearing, counsel for the government stipulated that the government will not offer any evidence derived from the vehicle searches, and counsel for the defendant agreed that the Motion To Suppress accordingly is moot insofar as it seeks suppression of such evidence.

Interpreters' Unit in New York.  Comments by the defendant during some of those conversations reflected awareness of the possibility of passage of legislation to confer amnesty for illegal aliens. *See* Gov't Exh. 1 at 5; Gov't Exh. 2 at 7-8.

Bell sought and obtained warrants to arrest the defendant and search his residence.  Prior to executing the warrants, Bell knew that the defendant was a native of Brazil, had spoken only Portuguese during the six recorded conversations, had no criminal record, and was a small man – standing only about five feet four inches tall and weighing about 130 pounds.  Bell had no basis before execution of the warrants to believe that the defendant was violent, kept weapons in his apartment or knew any English apart from small Dunkin' Donuts-related phrases.

Bell and a group of other law-enforcement officers executed the warrants on August 22, 2006. No interpreter was present during execution of the warrants, although there was room in the officers' vehicles for an additional person.  Prior to executing the warrants Bell, as case agent and team leader, briefed participating officers, including Remsen, ICE Senior Special Agent Rich Zabel, who was in charge of the search team, ICE Special Agent Doug McDonnell, ICE Special Agent John Cremonini and Special Agent Joseph DeSantis of the Social Security Administration Office of the Inspector General.  The team, consisting of a total of eleven or twelve law-enforcement officers, then traveled in several unmarked vehicles to the defendant's residence, an apartment within a multi-unit building at 409 Main Street in Biddeford.  Each of the participating officers was dressed in plainclothes but wore a jacket identifying himself as a police officer or agent and carried a duty sidearm (an automatic pistol).[3]  Upon arrival at 409 Main Street at approximately 3:30 p.m., Bell and others observed the

---

[3] When pressed on cross-examination why it was necessary to send a team of eleven or twelve armed individuals to execute the search and arrest warrants, Bell plausibly explained that (i) agents were aware that the defendant had as many as three roommates, (ii) Bell had surmised, from his training and experience as an ICE agent, that the roommates likely were unlawfully present in the United States, (iii) he had assembled sufficient numbers of agents so that two could arrest each individual if need be, and (iv) for officer safety, additional officers were needed to stand guard outside the building while arrest and search warrants were executed.

two cars the defendant had been seen driving parked in front of the building.  Zabel knocked on the door to the defendant's apartment (No. 103) and announced that police were present with a warrant. There was no response.  He again knocked and announced officers' presence; again, there was no response.  DeSantis then used a ram to force the door open.  Officers entered the two-bedroom apartment, finding the defendant in one bedroom and another gentleman, whom they identified as Edinei de Olivera Araujo, in the other.

Araujo was handcuffed, escorted out of his bedroom and placed on a couch in the living room. Following questioning by ICE agents, he was arrested on charges of violating immigration laws and transported to the Portland ICE office.  The defendant, who had been sound asleep in bed clad only in boxer shorts, awoke to find a  person – he was not initially sure if the individual was a law-enforcement officer or a robber – pointing a gun at his face and screaming at him.  The defendant put both hands up in the air, whereupon he was handcuffed, escorted from his bedroom, taken to the dining-room table and seated there.  He saw a total of seven officers milling about his apartment. Once officers had removed Araujo from the apartment and completed a protective sweep, they unhandcuffed the defendant.  He remained dressed solely in his boxer shorts; however, Bell testified that it was probably 100 degrees in the apartment.  Officers by then had reholstered their duty sidearms.[4]

As a team of officers searched the apartment, seizing among other things three computer CPUs, one laptop computer, compact discs and more than $1,000 in cash, DeSantis and Bell interviewed the defendant at the dining-room table.  The defendant remained unhandcuffed.  DeSantis and Bell

---

[4] Bell testified that once Araujo was removed, one of the officers retrieved a pair of pants or shorts for the defendant, which the defendant put on.  However, both the defendant and a different law-enforcement eyewitness, Steven Crogan, testified that the defendant was clad only in boxer shorts while being interviewed at the dining-room table.  In my view, nothing turns on whether the defendant was wearing pants or only boxer shorts; however, for purposes of discussion I credit the testimony that he was clad only in boxer shorts.

identified themselves as law-enforcement agents, showed the defendant their credentials and copies of the warrants issued for his arrest and the search of his apartment, and explained why they were there. Bell then asked the defendant if he could understand English. The defendant said he could. Bell presented the defendant with a Portuguese translation of *Miranda* warnings and queried whether he could read in Portuguese. The defendant said he could. The defendant then read the document and, at approximately 4:15 p.m., signed and dated a section stating that he had read his rights and was aware of them. *See* Gov't Exhs. 13-14.[5] The defendant did not sign a section of the Portuguese document titled "Termo de Renuncia," or "Waiver." *See id.* The Waiver section stated, *inter alia*, that the signer was available to make a statement and answer any questions and did not wish a lawyer's assistance at that time. *See id.* However, asked on cross-examination whether, by signing the Portuguese document, the defendant understood that he was agreeing to talk to the agents, he replied, "Yes, I was agreeing that what I was saying would be taken as my testimony."

Bell then presented the defendant with a form setting forth his *Miranda* rights in English, which Bell read aloud to him. *See* Gov't Exh. 12. At the conclusion of that reading, Bell queried whether the defendant understood his rights, and the defendant said yes. Bell then informed the defendant that if he had any problems communicating in English, Bell could contact a translator who would assist them during questioning.[6] The defendant said that he did not need an interpreter. However, he told the agents that if they needed assistance, he had a friend in the neighborhood he could call on. Bell told him that agents could not use his friend as an interpreter. The defendant signed a "Waiver" section on the English form stating, *inter alia*: "I have had the above statement of my rights read and explained to

---

[5] Bell testified that DeSantis had supplied the Portuguese document, a copy of which was admitted as Gov't Exh. 13, and that he (Bell) later arranged for the DHS Interpreters' Unit to translate that document into English. A copy of the English translation was admitted as Gov't Exh. 14.

[6] Bell could have used his cell phone to call the DHS Interpreters' Unit in New York, which is available twenty-four hours a day, seven days a week, and could have put an interpreter on speakerphone.

me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity." *Id*.

Bell and DeSantis, neither of whom speaks Portuguese, then questioned the defendant in English.  He told them, in English, that he was a citizen and national of Brazil and had entered the United States in April 2001 on a tourist visa authorizing him to remain for a period not to exceed six months – a story corroborated by passport and visa documents found by agents conducting the search – and that he had filed some kind of paperwork relative to his immigration status.  He also told them he was working at Dunkin' Donuts and had three roommates, each of whom he charged rent of $200 per month.  The agents also questioned the defendant about manufacture of counterfeit Social Security cards.  He initially denied having engaged in such activity.  However, after Bell apprised him that agents knew he had produced and sold such documents to a confidential informant who worked for ICE, he admitted he had made six or seven.  Agents, who knew that confidential informants had purchased twelve Social Security cards from the defendant, pressed him to come clean and tell the truth.  The defendant continued to make what Bell surmised were untruthful statements, and agents concluded the interview.  Bell then wrote a statement in English reflecting what the defendant had told the agents.  Bell read the statement aloud to the defendant and permitted him to review it.  The defendant did not appear to Bell to have any difficulty understanding it.  The defendant initialed each page of the statement, initialed a change on page two, and signed it at approximately 5:27 p.m.  *See* Gov't Exh. 15.

After agents finished their search of the defendant's apartment, one suggested to Bell that for the sake of completeness they should search the two vehicles as well.  Bell asked the defendant if he would consent to a search of the two vehicles he had under his control, a 1988 blue Mazda and a white Volkswagen Jetta.  The defendant said he would, and signed a form in English so indicating.  *See*

Gov't Exh. 16.  No translation was provided of that consent-to-search form.  The vehicles were searched.  Nothing of any significance was found or seized from them.  Bell later learned that the defendant did not own one of the two vehicles, although he had been seen during surveillance driving both.[7]  At the conclusion of the searches, the defendant was placed under arrest and transported to the Cumberland County Jail.  The following day Bell visited the defendant, told him he had the right to contact a consular representative of his country and provided him with a printout containing contact information for the Brazilian consulate in Boston.  *See* Gov't Exh. 18.  The defendant signed his name beneath a statement Bell had handwritten in English, "I received a copy of the contact sheet for the Brazilian consulate located in Massachusetts."  *Id*.  The defendant appeared to Bell to understand what Bell was talking about.[8]

---

[7] The defendant testified that he was considering buying the white Jetta and had driven it to an auto-body shop for a check earlier on the day he was arrested.

[8] Via an interpreter, the defendant testified to a very different version of events.  He estimated that officers entered his apartment between 10:30 and 11 a.m., not 3:30 p.m., because an alarm clock he had set for 2 p.m. had not gone off, he saw a time of 11:30 a.m. on the kitchen microwave clock while seated at the table, and he observed, through a window, a roommate arriving at the building who always arrived home from his Dunkin' Donuts job between 12:15 and 12:30 p.m.  He denied that Bell or DeSantis showed him copies of the search and arrest warrants.  He maintained that, when the interview commenced, he was having trouble understanding the agents even after they reformulated questions several times, and DeSantis tried interpolating some Spanish words.  At that point, according to the defendant, he suggested he could call in a friend to help him understand, but Bell said no, the agency had its own interpreters.  The defendant testified that he continued struggling to understand the agents' questions, which they continued trying to reformulate, throughout the approximately hour-long interview, but Bell never placed a phone call to an interpreter.  The defendant further testified that he changed his story regarding involvement in production and sale of Social Security cards only after DeSantis stood up, raised his voice, moved across the table toward him with handcuffs in hand, shaking them, and said something the defendant could not understand apart from the word "jail."  The defendant stated that he understood DeSantis to be communicating that if he agreed to talk, he would not go to jail, but if he refused, he would go to jail.  He testified that he then said, "OK, OK, OK, I'll talk," to avoid going to jail.  Finally, the defendant testified that Bell and DeSantis presented him for the first time with the entire stack of documents for his signature (the Portuguese and English versions of *Miranda* rights, the form authorizing search of the vehicles and the written statement) only at the conclusion of their interview of him.  He denied that Bell read the English version aloud to him or discussed with him the meaning of the consent-to-search form.  For several reasons, I do not credit this version of events.  First, times noted on the documents themselves corroborate Bell's story that officers entered the apartment at about 3:30 p.m., presented the defendant with his *Miranda* rights, obtained a written waiver of those rights, interviewed him and then concluded by asking him to sign the written statement.  *See* Gov't Exhs. 12 (indicating defendant was taken into custody at 3:35 p.m. and signed waiver in English of *Miranda* rights at 4:15 p.m.), 13 (indicating defendant signed Portuguese statement of *Miranda* rights at 4:15 p.m.), 16 (indicating defendant signed consent-to-search form at 4:50 p.m.) & 15 (indicating defendant signed written statement at 5:27 p.m.).  Second, Bell testified that he remembered the time of execution of the warrant was 3:30 p.m. because the team had been planning to execute the warrant at 2:30 p.m. but was delayed an hour after he discovered that the warrant application had omitted to list items to be seized, whereupon he contacted the United States Attorney's Office to assist in correcting the oversight.  Third, the defendant himself essentially admitted a willingness to lie when under pressure.  He maintained on cross-examination that he had lied in telling the agents he had made Social (*continued on next page*)

As of the time of the defendant's arrest he was working both at Dunkin' Donuts and at a Hannaford grocery store. His employment at Hannaford, which entailed cleaning duty at night after the store closed, did not require him to speak English. He maintained a circle of Brazilian friends, all of whom spoke Portuguese. The defendant was employed as a police officer in Brazil for seventeen years. He knew that, pursuant to Brazilian law, arrestees must be informed that they have a right to remain silent and a right to the assistance of an attorney. When the defendant was asked during an initial appearance in this court whether he understood certain rights, he mentioned that he had been a police officer in Brazil.

## II. Discussion

In his papers, the defendant contended that he was coerced or tricked into making involuntary statements and signing documents that he did not understand (the waiver of *Miranda* rights and consent-to-search form) by officers' (i) refusal to supply a translator despite being on notice, from months of prior surveillance, that a Portuguese translator would be helpful, if not necessary, to ensure he understood his *Miranda* and other rights, and (ii) threatening and misleading conduct, designed to send the message that if the defendant offered incriminating statements, he would not be handcuffed or arrested. *See* Motion To Suppress at 5-7. At hearing, defense counsel also argued that the defendant's will was overborne when officers employed unnecessary, overwhelming force despite knowing that the defendant was a small man who was not known to be violent or to harbor weapons. In the face of a challenge such as this, the government bears the burden of proving *Miranda* compliance, *see, e.g.,*

Security cards for two individuals, even though he had not, just to get them to stop pushing him to say more. Fourth, on occasion while testifying at hearing the defendant answered a question before a translation was given, betraying a command of English greater than claimed. Fifth and finally, Steven Crogan, resident agent in charge of the Portland ICE office, testified as a rebuttal witness that (i) he heard and saw portions of the defendant's August 22, 2006 interview with DeSantis and Bell, (ii) it was clear to him that the participants understood each other, albeit their conversational pace was slow, (iii) he did not hear Bell or DeSantis ask questions repeatedly or use Spanish words to get the defendant to understand them, (iv) he did not see DeSantis stand up, brandish a set of handcuffs and shake them, and (v) he did not overhear DeSantis threaten that the defendant would go to jail if he did not talk. While Crogan's testimony is of limited usefulness inasmuch as Crogan admitted he was in and out of the room and did not see or hear the (*continued on next page*)

*United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and the voluntariness of a confession, *see, e.g., United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990).  I find that the government meets that burden in this case.

### A.  *Miranda* Waiver

As the First Circuit has noted:

> A defendant may make a valid waiver of his rights under *Miranda* if he does so voluntarily, knowingly and intelligently.  The district court must begin with the presumption that the defendant did not waive his rights.  The government bears the burden of proving a valid waiver by a preponderance of the evidence.

*United States v. Downs-Moses*, 329 F.3d 253, 267 (1st Cir. 2003) (citations omitted).  A waiver is considered "voluntary" if it was "the product of a free and deliberate choice rather than intimidation, coercion and deception"; it is "knowing and intelligent" if "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon."  *United States v. Rosario-Diaz*, 202 F.3d 54, 69 (1st Cir. 2000) (citations and internal quotation marks omitted).  The question whether a given waiver was voluntary, knowing and intelligent is examined with reference to "the totality of the circumstances and the facts surrounding the particular case including the background experience and conduct of the accused."  *Id*. (citation and internal quotation marks omitted).  Asserted language difficulty is among those relevant circumstances.  *See, e.g., United States v. Alarcon*, 95 Fed. Appx. 954, 956 (10th Cir. 2004) ("Warnings given in a language which the defendant cannot comprehend do not convey the substance of the suspect's rights."); *United States v. Garibay*, 143 F.3d 534, 537 (9th Cir. 1998) ("In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, we consider, as one factor, any language difficulties encountered by the defendant during custodial interrogation.").

---

entire interview, it tends, in totality with the other points mentioned, to call into question the defendant's version of the interview.

I turn first to the question whether the defendant's waiver was voluntary.  As the First Circuit has observed, while mental history or state is pertinent to a voluntariness inquiry, "the precedents still require some degree of coercion or trickery by government agents to render a statement involuntary[.]" *United States v. Santos*, 131 F.3d 16, 19 (1st Cir. 1997); *see also, e.g., United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006) ("[T] he fact that Rojas-Tapia has a relatively low I.Q., standing alone, is not dispositive of the waiver determination.  A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness.  Rather, the voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word.") (citations and internal punctuation omitted).

In his papers and via counsel at hearing, the defendant catalogued several assertedly coercive tactics on the part of officers who effectuated his arrest and interrogated him on August 22, 2006, including (i) the decision to employ a team of eleven to twelve officers despite knowing that the defendant was a small man with no prior criminal history, no known stash of weapons and no violent propensities, (ii) the ramming down of the front door and pointing of a gun in the defendant's face as he lay asleep in bed, (iii) the asserted ignoring of the defendant's request for a translator, (iv) DeSantis' alleged misconduct in raising his voice, shaking the handcuffs and causing the defendant to understand that he would be jailed if he did not confess, and (v) the undertaking of an interview while the defendant was clad only in boxer shorts, presumably for the purpose of further intimidating him.

These arguments notwithstanding, I find that the government has proved by a preponderance of the evidence that the following were not coercive or abusive tactics:

10

1. The decision to employ a team of eleven or twelve armed officers. Bell plausibly explained that he calculated that as many as four arrests might need to be made, based on intelligence that the defendant had three roommates and suspicion that those three likely were illegal aliens. Two officers were needed per potential arrestee, and additional officers were required to guard the perimeter of the building during execution of the arrest and search warrants. Moreover, after the defendant was apprehended, he was interviewed by only two officers, Bell and DeSantis.

2. The ramming of the front door and the pointing of a gun in the defendant's face. The door was rammed down for the simple reason that, when officers knocked and announced their presence with warrants, there was no response. Weapons were drawn as a precaution until the defendant was taken into initial custody. No weapon was brandished at the defendant at any time thereafter.

3. The fact that the defendant remained clad only in boxer shorts. The warrants were executed in mid-August, and the defendant's apartment was hot. The defendant did not testify that he was physically or emotionally uncomfortable during his interview with Bell and DeSantis as a result of his state of dress.

4. The decision not to bring a translator to the premises or place a call to a translator during the interview. Agents need not have brought a translator to the residence when one was available by phone. Further, Bell did take the precaution of providing a translation of *Miranda* rights in Portuguese and of inquiring whether the defendant understood English. The defendant said he did. While the defendant offered to obtain the services of a friend to serve as a translator to assist the agents, Bell did not understand him to be requesting a translator for his own benefit. In any event, even assuming *arguendo* that the defendant did request a translator, he was nonetheless able to understand the agents, and make himself understood to them, sufficiently well that Bell reasonably

could have concluded no translator was needed. For example, the defendant gave responsive answers to questions concerning his rental of the apartment, his immigration status and his purported counterfeiting of Social Security cards.[9]

5.      DeSantis's conduct. As discussed above, I do not credit the defendant's testimony that DeSantis stood up, raised his voice, rattled handcuffs and threatened to jail him if he did not confess. Both Bell and DeSantis asked the defendant pointed questions and pressed him as to the veracity of his answers. However, when the defendant continued to insist he had sold no more than six or seven cards, they concluded the interview. The entire interview lasted little more than an hour.

For the foregoing reasons, the government meets its burden of demonstrating that officers did not extract a *Miranda* waiver from the defendant by way of coercive or abusive tactics.

The question remains whether the defendant's waiver of his *Miranda* rights was knowing and intelligent. Here, again, the government carries its burden. Bell both provided the defendant with a Portuguese translation of *Miranda* rights and read them aloud to him in English. The defendant was familiar with *Miranda*-like rights from his seventeen years as a police officer in Brazil, where arrestees have the right to remain silent and the right to representation by an attorney. While the defendant did not sign the "Waiver" section of the Portuguese form but rather signed the "Waiver" section of the English form, he admitted on cross-examination that he understood he was agreeing that what he said to agents would be taken as his testimony. Finally, I am satisfied that despite the defendant's claim to the contrary, Bell and DeSantis went over the *Miranda* forms with him prior to, rather than following, custodial interrogation. The defendant accordingly made a knowing and

---

[9] During hearing, defense counsel questioned how well the defendant could have understood the consent-to-search form in view of the fact that he agreed to a search of a vehicle that he did not even own. However, Bell testified, and the form reflects, that the defendant was asked to consent to a search of the two vehicles over which he had control. *See* Gov't Exh. 16. The defendant had been seen driving the white Jetta, and himself admitted that he had driven it earlier on the day of his arrest. The defendant's signature on the consent-to-search form as worded accordingly does not, in itself, reflect a fundamental misunderstanding.

intelligent waiver of his *Miranda* rights. *See United States v. Lee,* 317 F.3d 26, 33 (1st Cir. 2003) (finding record inhospitable to appellant's claim that his consent to search van was vitiated by lack of comprehension; noting, "While we appreciate that English is the appellant's second language and that he had the assistance of an interpreter at trial, he has resided in the United States for many years. Perhaps more important, there is nothing in the record to indicate that the appellant was unable to understand Joy's questions, that he had any difficulty in communicating with the officers at the scene (or afterwards for that matter), or that he had any problem comprehending the consent form. These circumstances undermine the credibility of any claim that lack of comprehension led him down a primrose path."); *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir. 1989) (finding that "[e]ven though his proficiency in the English language may have been limited, it did not prevent [the defendant] from making a knowing and intelligent waiver of his constitutional rights" where the evidence showed that although the defendant spoke in broken English and occasionally lapsed into Spanish, he indicated on each occasion that he was advised of his rights that he understood them).

### B.  Voluntariness of Statements

I next consider whether the defendant's statements to Bell and DeSantis were the product of coercive questioning and, hence, involuntary. Involuntary confessions violate the due-process clauses of the Fifth and Fourteenth amendments. *See, e.g., United States v. Genao*, 281 F.3d 305, 310 (1st Cir. 2002). In the face of a defendant's claim that his confession was extracted involuntarily, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940). As this language suggests, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). *See also, e.g., Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) ("A confession or other admission is not deemed

13

coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged.  The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

For reasons discussed above in considering whether the defendant's *Miranda* waiver was voluntary, I find that the government meets its burden of proving the defendant's statements, as well, were voluntarily made.

### III.  Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be (i) **DEEMED MOOT** insofar as it concerns evidence seized from vehicles and be (ii) otherwise **DENIED**.

### <u>NOTICE</u>

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 2nd day of January, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge